UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Dewayne Lovett,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　)　　No. 16 CV 50246
　　　　　　　　　　　　　　　　　　　)　　Magistrate Judge Iain D. Johnston
Nancy A. Berryhill, Acting　　　　　　)
Commissioner of Social Security,[1]　　)
　　　　　　　　　　　　　　　　　　　)
　　　　Defendant.　　　　　　　　　　)


## MEMORANDUM OPINION AND ORDER

Plaintiff Dewayne Lovett seeks social security disability benefits based on back pain that first emerged after a car accident in June 2011, when he was 42 years old. Since that time, he has seen several doctors, including Dr. Vo, a spine physiologist, who treated plaintiff from approximately August 2011 until the end of 2012; Dr. Velimirovic who performed an L5-S1 discectomy in March 2012; Dr. Freeman, a pain specialist, who treated plaintiff for a two month period in late 2013 to early 2014; and Dr. Norem, a primary care physician, who began treating plaintiff in October 2013 and who was still treating plaintiff at the time of the administrative hearing. Plaintiff has tried varying treatments to relieve his back pain, which was mostly on the lower right side and sometimes caused numbness or tingling in his right leg. These treatments included trigger point injections, the surgical procedure noted above, electric stimulators, medications (*e.g.* Tramadol and Lidoderm patches), and physical therapy.

On November 7, 2014, a hearing was held before the administrative law judge ("ALJ"). At the start of the hearing, plaintiff's counsel stated that she had recently submitted a medical source statement from Dr. Norem. The ALJ stated that she had not seen this opinion, nor any

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

1

treatment records from Dr. Norem who, she noted, was plaintiff's primary physician. Plaintiff's counsel stated that she would "re-upload that" (it's not clear whether the "that" meant just the 2-page opinion or also the related treatment records).The ALJ stated that she would "take a look, then later today." R. 42.

Plaintiff then testified about his ongoing pain, treatment, and activities. His daily pain averaged a four on a scale of ten, and he treated it with "Tramadol patches, lidocaine patches, tramadol, and electronic stimulators." R. 42. He used the Tramadol every day and used the electric stimulator, or TENS unit, two to three times a week. He tried physical therapy. His doctors offered to perform a surgery where "[t]hey [] go in and burn nerves," but plaintiff decided against this procedure because he did not "want them burning the wrong nerve, and still have the pain, and have to go in for multiple surgeries." R. 43. Plaintiff stated that his doctors rated the chance that such a procedure would be successful at 50/50. Counsel asked plaintiff about the fact that his medical records showed "that you have not had much treatment as of late." R. 44. Plaintiff stated that "[t]here's not much they can do." Plaintiff last saw his primary care physician, Dr. Norem, the previous week and then six months before then. When asked how long he could sit, plaintiff answered that he has "got to keep moving around constantly." *Id.* He stated that he could walk "[p]robably less than a block." R. 45. On an average day, he would "[g]et up, have breakfast with the kid, send her out to school, sit down or lay down and watch TV, wait for her to get home from school." R. 45. The "kid" was plaintiff's five-year old daughter who had Down syndrome. Plaintiff did not lift her up at all. The daughter went to school four hours a day. The ALJ asked about a vacation plaintiff took to Florida, his pool playing, and other activities. These are discussed further below. At the end of the hearing, the ALJ referred to Dr. Norem's

records and opinion and stated that she would "[h]opefully" get them and "then . . . make a decision." R. 60.

On February 10, 2015, over three months after the hearing, the ALJ issued her decision finding plaintiff not disabled. The ALJ found that plaintiff's degenerative disc disease qualified as a severe impairment, but that it did not meet Listing 1.04. In the residual functional analysis ("RFA"), the ALJ found that plaintiff was able to perform light work. The ALJ noted that there were "significant gaps" in plaintiff's treatment history. One was a year gap after plaintiff stopped treatment with Dr. Vo in late 2012 and then resumed treatment with Dr. Freeman in December 2013. The second was 10-month gap from the end of treatment with Dr. Freeman in early February until the hearing in early November 2014. The ALJ found that plaintiff had taken "appropriate medications" for his impairment that had been "relatively effective in controlling [his] symptoms." R. 20. The ALJ also noted that plaintiff "admitted" driving to Florida on a vacation and "admitted to an active lifestyle that included socializing with friends, playing pool and caring for his daughter." R. 20-21. The ALJ acknowledged that Dr. Norem had provided a medical source statement, dated November 3, 2014 (Ex. 8F), which stated (among other things) that plaintiff could sit for less than one hour a day, that he could stand or walk for less than one hour, that he would be off task more than 30% due to pain, and that he would miss work more than five days a month. However, the ALJ gave the opinion little weight. Because the ALJ's explanation is important, the Court will quote it in full. The three paragraphs roughly correspond to the three major rationales.

> As for the opinion evidence, the undersigned gives little weight to Dr. Norem's opinion, as the record contained no actual treatment notes from the doctor. There is no indication of when the doctor examined the claimant or what his findings were at that time. Since there are no treatment notes associated with this opinion, the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another

> reality, which should be mentioned, is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.
>
> Dr. Norem's opinion also contrasts sharply with the other evidence of record, which renders it less persuasive. The claimant admitted in early 2014, several months before Dr. Norem gave his opinion, that medications controlled his pain. After noting medications controlled his pain, the claimant did not seek any additional treatment, which suggests his pain remained controlled at the time of Dr. Norem's opinion. Dr. Norem also considered radiculopathy as a limiting factor when giving his opinion, but recent treatment notes from the claimant's pain management doctor showed the claimant did not suffer any radicular pain or symptoms.
>
> The claimant also admitted to activities of daily living that [are] not as limited as Dr. Norem opined in his medical source statement. Dr. Norem stated the claimant could sit for less than 1-hour total per day, but, as noted above, the claimant successfully drove from Illinois to Florida and back in the summer of 2012, just months after undergoing back surgery. The claimant also cared for his daughter with Downs Syndrome and played pool with friends.

R. 25-26 (citations omitted).

On April 10, 2015, two months after the ALJ's decision, plaintiff submitted a letter to the Appeals Council arguing that the case should be remanded on the basis of new and material evidence. This evidence consisted of Dr. Norem's treatment records from October 21, 2013 to March 17, 2015. Plaintiff offered the following explanation for why these records had not been submitted earlier: "Unfortunately, these records were not available at the time of the hearing due to some apparent confusion about Claimant's name. Dr. Norem's office had the Claimant listed under Wayne Lovett instead of DeWayne Lovett, and this apparently caused some confusion for someone in Dr. Norem's records department." R. 267. On July 8, 2016, the Appeals Council denied the appeal in a form letter that refers to this new evidence, but contains no analysis and no clear indication of whether the ALJ considered this evidence to be new and material. R. 1-4.

4

**DISCUSSION**

Plaintiff raises four arguments for remand: (1) the Appeals Council wrongly found that the treatment records from Dr. Norem were not new or material; (2) the ALJ misapplied the treating physician rule; (3) the ALJ failed to fully consider whether plaintiff met Listing 1.04; and (4) the ALJ misconstrued plaintiff's activities of daily living. The Court finds that a remand is warranted based on the second and fourth arguments.

**I.     Dr. Norem's Treatment Records and the Appeals Council.**

The first argument is difficult to assess. For one thing, as both sides recognize, the plaintiff can only challenge the decision of the Appeals Council if it concluded that the Norem records were *not* new and material. If the Council concluded that they were, then this Court is not permitted to otherwise review the decision. But deciphering which of these two decisional paths was followed would require a virtual divining rod to ferret out the few flickers of information from the boilerplate. Another not-fully-resolved issue is whether this evidence can be considered "new." Stated differently, who is to blame for the failure to timely supply the records? Neither side provides a satisfying answer. Plaintiff has suggested that the problem resulted from a name mix-up at Dr. Norem's office, but there are no documents to verify this assertion. It is not clear when plaintiff first requested these records, as the only request this Court found was a March 25, 2015 letter. R. 747. This letter was sent four months after the hearing, and well over a month after the ALJ's decision. The letter does not refer to an earlier, timely request. If this were the first request, then plaintiff's counsel dropped the ball on this issue. At the same time, a question could be raised as to why the ALJ did not follow up on this issue. The parties discussed these records at the hearing, and the ALJ indicated that she wanted to review them before issuing a decision. The ALJ cited their *absence* as a key reason for rejecting Dr.

Norem's opinion. Given these uncertainties and given that the Court has concluded that a remand is warranted based on other arguments, the Court will not further analyze this issue. But in the future, the ALJ and plaintiff's counsel should take more effort to ensure that these records are made available in timely manner.

**II.     The Treating Physician Rule.**

In his opening brief, plaintiff argues that the ALJ violated the treating physician rule in various ways. The Government argues, in response, that the ALJ "generally" gave "good reasons" for rejecting the opinion. This argument tacitly concedes that the ALJ failed to *explicitly* follow the treating physician rule, but argues essentially that the ALJ implicitly addressed all the relevant criteria. The parties and this Court have been on this merry-go-round many times before. As this Court has explained at greater length in earlier opinions, this Court takes the view that an explicit analysis under both steps of the treating physician rule is required, including an explicit discussion of the six factors under the checklist. *See Duran v. Colvin*, 2015 U.S. Dist. LEXIS 101352, *8-9 (N.D. Ill. Aug. 4, 2015). Here, the ALJ did not provide such an analysis. But even if the Court allowed an implicit analysis, the Court still would find that the ALJ's explanation is insufficient. The Court will address the ALJ's three major rationales, reflected in the three paragraphs quoted above.

**A. Missing Treatment Records and Doctor Sympathy.** The first rationale requires us to revisit the issue of the missing treatment records. The ALJ stated that, given that "the record contained no actual treatment notes" from Dr. Norem, the "possibility always exists" that his opinion was merely provided out of sympathy for plaintiff. Specifically, the ALJ noted that there was "no indication of when the doctor examined" plaintiff or "what his findings were at the

6

time." The ALJ also noted "[a]nother reality," which was that patients in general "can be quite insistent and demanding in seeking" opinions.

Even if the ALJ were justified in not waiting for the treatment records, this rationale is problematic on several levels. First, there is ambiguity about what inferences the ALJ drew regarding the length and nature of plaintiff's treatment with Dr. Norem (*i.e.* the first two checklist factors). The ALJ's statements are vague and suggest differing conclusions. Did the ALJ believe that Dr. Norem never really treated plaintiff at all or only that he had not seen plaintiff *recently* or maybe, even more specifically, had not seen plaintiff on the date he rendered the opinion? The ALJ's statements do not provide a clear statement, one way or another, about what she believed was the nature of the treatment relationship. However, even without the treatment records, the ALJ knew from plaintiff's testimony that he had seen Dr. Norem in the last week before the hearing, which would mean that plaintiff saw Dr. Norem very close to the date the opinion was issued. Accordingly, contrary to the ALJ's statement, there is some "indication" that Dr. Norem examined plaintiff contemporaneously with his opinion.[2]

Second, it should be noted the ALJ's reference to the *always-present* possibility of sympathy is, when stated in such an abstract way, not a basis for simply rejecting an opinion. *See generally Modjewski v. Berryhill,* 2017 WL 1011468, *3 (E.D. Wisc. March 14, 2017) ("Plaintiff is correct that a doctor's desire to help a patient prove his claim for disability benefits is not by itself a sufficient reason for discounting a treating physician's opinion. Nonetheless, the Seventh Circuit has acknowledged the bias to which treating physicians may be subject[.]").[3] Here, the

---

[2] This fact would also cast doubt on the ALJ's conclusion that there was a ten-month treatment gap after February 2014.

[3] The Court recognizes that Seventh Circuit authority exists that allows an ALJ to question the bias and credibility of a treating physician's opinion. *See Holfslein v. Barnhart*, 439 F. 3d 375, 377 (7th Cir. 2006) (it "is well known, many physicians (including those most likely to attract patients who are thinking of seeking disability benefits) will often bend over backwards to assist a patient in obtaining benefits."). But the publication upon which the Seventh Circuit made this broad sweeping statement specifically did not research the source of why biases existed. Seth A.

ALJ cited no evidence to suggest that plaintiff pressured Dr. Norem or that Dr. Norem did not believe his opinion was genuine. The only evidence the ALJ cited is part of the second rationale, to which the Court now turns.

**B. Substantial Departure From Other Medical Evidence.** The ALJ speculated that there could be sympathy bias because (according to the ALJ) Dr. Norem's "depart[ed] substantially" and "contrast[ed] sharply" with the "rest of" the evidence. This is a bold claim, asserting that it was not even a close call and that Dr. Norem's opinion was an outlier far removed from all other medical statements. However, the evidence the ALJ cited for this conclusion is questionable, and also relies in part on layperson analysis.

The ALJ pointed to two facts to support the conclusion. One fact was that plaintiff supposedly "admitted in early 2014, several months before Dr. Norem gave his opinion, that medications controlled his pain." This admission is based on notes from two visits with Dr. Freeman, one on January 13, 2014 and the other on February 10, 2014. But it is a linguistic stretch to say that plaintiff "admitted" to the broader conclusion being suggested. It would be more accurate to state that plaintiff, at least in the second of these two visits, reported a reduction in pain and that this observation could lead to an inference that he believed his medications were

---

Seabury, Robert T. Reville & Frank Neuhauser, *Physician Shopping in Workers' Compensation: Evidence from California*, 3 J. of Empirical Legal Studies 47, 50 (2006). Moreover, the article focused on physician "shopping," meaning attempting to locate a physician who would provide a positive opinion. Accordingly, a long term treating physician providing a continuity of care would not fit that bill. Here, as in many cases this Court reviews, the treating physician had a fairly long relationship, and there was no evidence of "shopping." Dr. Norem treated plaintiff for over a year before the hearing and then over a year after the hearing. Moreover, both courts and ALJs tend to find bias both ways, and therefore, the applicant is damned either way. If the physician has a long-term relationship with the applicant, then the physician is biased because the physician has developed a close, personal relationship with the applicant. But if the physician has a short relationship, then the physician is biased because the applicant "shopped" for the physician. And if "shopping" for a physician is a source of bias, then aren't state agency physicians, upon whom ALJs and the Administration repeatedly rely, the classic example of a bought physician? Further complicating the issue is other Seventh Circuit cases stating that there is no presumption of bias on the part of treating physicians. *See Edwards v. Sullivan*, 985 F.2d 334, 337 (7th Cir. 1993) ("[T]here is no presumption of bias in a treating physician's disability opinion. Rather, the ALJ has the ability, as the trier of fact, to consider the physician's possible bias.") The alleged "reality" of a treating physician bias is just one more vexing issue in disability appeals.

working.[4] Specifically plaintiff stated at the February 10, 2014 visit that the Lidoderm patches Dr. Freeman recently prescribed were "very helpful with regards to his pain" and that his pain was then "a 2/10 in intensity." R. 706. But this does not necessarily mean that the pain reduction was permanent, especially because plaintiff had previously seen a reduction in pain that proved to be temporary. In fact, in the "Plan" portion of these notes, Dr. Freeman articulated several stronger measures that might need to be taken in the future, suggesting that he was not confident this solution was permanent. Here again, this is why the treatment records from Dr. Norem, which cover the period subsequent to this visit, may be important.

      The other fact relied on by the ALJ was that Dr. Norem stated in the "Diagnoses" portion of his opinion that plaintiff had "radiculopathy," in addition to "chronic back pain," whereas Dr. Freeman, in the notes from the same two doctor visits discussed above, wrote that plaintiff was not then reporting radiculopathy symptoms. Was this a major contradiction as the ALJ suggested? Based on the current record, it is not clear. As a preliminary point, both doctors agreed that plaintiff was experiencing pain in the lower right side of his back. The difference seems to be whether this pain was axial (Dr. Freeman) versus radial (Dr. Norem). One reason why it is hard to assess how significant this difference was to the bottom-line issues is that the ALJ did not call a medical expert at the hearing, and no other medical expert opined on this issue insofar as this Court can tell. Therefore, in this instance, the ALJ's analysis rested on an improper layperson assessment of the medical findings. *See Lewis v. Colvin*, No. 14 CV 50195, 2016 U.S. Dist. LEXIS 115969, *11 n. 3 (N.D. Ill. Aug. 30, 2016) (courts, counsel, and ALJs must resist the temptation to play doctor). In any event, even if there were a divergence of

---

[4] The notes from the first of these two visits clearly do not suggest that plaintiff believed his medications were working. Dr. Freeman reported that, although plaintiff "had 80-90% relief of his pain for two to three days" after a trigger point injection performed by Dr. Freeman, the "pain then returned and [] may have increased somewhat since that injection" and was at "an 8/10 in intensity." R. 708. In his physical exam, Dr. Freeman noted that plaintiff "appears uncomfortable on today's visit" and "does appear to demonstrate several pain behaviors." *Id.*

opinion between Dr. Freeman and Dr. Norem, it is not clear that the other doctors one-sidedly favored Dr. Freeman's interpretation. In fact, several doctors observed radicular symptoms or diagnosed radiculopathy, including a State Agency physician. *See* R. 280 (Dr. Vo, diagnosing "[r]ight L5 radiculopathy"); R. 695 (Dr. Dow, referring to "[r]ight L5 radiculitis"). In addition, the possibility exists that the lack of radicular symptoms was temporary. In the first of the two visits cited by the ALJ, Dr. Freeman wrote the following: "[Plaintiff] denies any radicular symptoms or numbness and tingling in the leg *but states that this is new and has not been present before*." R. 708 (emphasis added). In sum, the ALJ's conclusion that Dr. Norem's opinion radically departed from the other evidence is not justified based on the evidence and reasons cited by the ALJ.

**C. Activities of Daily Living.** The ALJ's third rationale for rejecting Dr. Norem's opinion was that it was at odds with plaintiff's activities—specifically, a Florida vacation, childcaring, and pool playing. The Court finds that the ALJ's reliance on these three activities rested on an aggressive rendering of the facts and downplayed other statements. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (the ALJ "ignored [claimant's] numerous qualifications regarding her daily activities").

The ALJ clearly believed that the Florida vacation was significant because this one incident was mentioned three separate times in the opinion. *See* R. 20, 23, 26. Here is how the ALJ characterized this incident: "the claimant successfully drove from Illinois to Florida and back in the summer of 2012, just months after undergoing back surgery." R. 26. However, there is a question of whether plaintiff, in fact, *drove* to Florida. At the hearing, he admitted going to Florida, where he "[j]ust hung out at the beach," but he stated that he flew each way. R. 49-50. However, in her opinion, the ALJ ignored this testimony and instead relied on two references in

10

doctor's notes to conclude that plaintiff "admitted" driving to and from Florida and doing so "successfully." But once again, the underlying evidence provides equivocal support for the supposed "admission." The first reference was written after he returned from vacation and merely states that plaintiff's back pain "[h]as gotten worse over the last month since he came back from his vacation in Key West." R. 417. There is no reference to driving versus flying. The second reference is from *before* the trip and stated that plaintiff "anticipates performing driving from FLA to IL during the week next week." R. 619. This statement does not state that plaintiff, in fact, drove, but it perhaps could support such an inference. One might reason that, if plaintiff were going to fly, then he presumably would have already bought a plane ticket. But even if the ALJ believed that this one cryptic reference was sufficient to find that plaintiff had essentially been lying in his hearing testimony, itself a tenuous conclusion, the ALJ should have confronted this fact head on in the opinion by acknowledging that plaintiff specifically denied driving rather than unqualifiedly stating that plaintiff made an "admission." The failure to do so raises the possibility that the ALJ simply overlooked the earlier testimony when writing the opinion. If so, then the opinion would rest on a mistaken factual premise. *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (an ALJ may not base a credibility determination on "errors of fact or logic").

Putting aside the issue of whether plaintiff actually drove, there is separate concern about placing so much weight on one trip. There is no evidence that plaintiff took other such trips, and this one trip caused plaintiff's condition to worsen, suggesting he may have pushed himself. In *Mitze v. Colvin*, 782 F.3d 879 (7th Cir. 2015), the Seventh Circuit considered a case where a plaintiff, who allegedly suffered disabling pain, took a 20-hour flight to and from Australia. The Seventh Circuit held that the flight *by itself* was not enough to cast doubt on the claimant's allegation, but when combined with other vigorous activities, was probative. *Id.* at 882 ("Not the

11

flights alone, not the daily running alone, not even the 5,000 meter-race alone, but the combination of all these things, is, the administrative law judge could reasonably conclude, inconsistent with having pain severe enough to preclude full-time employment.").

As for plaintiff's childcaring activities, the ALJ again described the activity in absolute terms without acknowledging qualifications. The ALJ noted plaintiff's childcaring duties several times and stated that that plaintiff "needed to keep an eye on his daughter, bathe her and change her diapers." R. 21. There was no mention of anyone else helping out. The impression created is that plaintiff was the primary caregiver.[5] But this description omitted the fact that plaintiff's wife, as well as friends, were involved. The Seventh Circuit has stated that ALJs should take into consideration that a claimant has additional help in activities such as caring for children. *See, e.g., Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). As far as specific duties, both plaintiff and his wife only referred to a few, such as taking the daughter to and from the bus stop and sometimes changing her diaper and sometimes reading to her. R. 229, 234, 237 ("watch TV is about all I do anymore").

As for the pool playing, the ALJ's characterization suggests that it was more vigorous and frequent than the evidence suggests. At the hearing, plaintiff stated that he only played "[j]ust every once in a while" when he has a "good day." R. 53. Likewise, on his Daily Function Report, plaintiff stated that he played a "little" pool. R. 237. There is no evidence in the record to contradict these assertions that the pool playing was sporadic. Moreover, it is not clear that such activity contradicted the doctor's opinion that plaintiff could only sit for an hour because plaintiff

---

[5] Although the ALJ did not specifically refer to plaintiff as the "primary" caregiver, the Government in its brief believed that the ALJ had done so. *See* Gov. Resp. at 13 ("The ALJ *considered that* Lovett served as the *primary caregiver* for his daughter, who required heart surgery in 2010, suffered from Down syndrome, and required bathing and changing of diapers (Tr. 20, 47-48). The ALJ *specifically* noted that evidence that Lovett was the *primary caregiver* for his daughter raised the question as to whether his continuing unemployment was actually due to medical impairments.") (emphasis added).

indicated that he had to move around frequently, a limitation that perhaps could be accommodated by an occasional pool game with friends.

For the above reasons, the Court finds that a remand is warranted under the treating physician rule. In reaching this conclusion, the Court is not dictating any result on remand, nor holding that the ALJ's reasons, if more fully explained, cannot be relied on in a future analysis. The record contains evidence that, if marshalled properly and fully explained, may support a denial of benefits. To resolve the technical issues related to plaintiff's back issues, on remand, the ALJ should call a medical expert. HALLEX I-2-5-34A.1. Given the above conclusion, the Court need not analyze the remaining arguments because they have either been addressed in the above analysis (fourth argument) or were not fully developed and can be addressed, if warranted, on remand (third argument).

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: June 26, 2017          By: _____
                              Iain D. Johnston
                              United States Magistrate Judge